[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14304

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 30, 2010
JOHN LEY
CLERK

D. C. Docket No. 05-02277-CV-TWT-1

JANE DOE, No. 1,
JANE DOE, No. 2,
JANE DOE, No. 3,

Plaintiffs-Appellants,

versus

FULTON-DEKALB HOSPITAL AUTHORITY,
d.b.a. Grady Health System,
ROBERT ROHR,
Director of Employee Relations,
WILLIAM REED,
Director of Psychological Services,
VENUS UPSHAW,
Clinical Director of the Drug Dependence Unit,
STEVE KIMBRELL,
ANTHONY STOVALL,
Manager of the Human Resources Department,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Georgia
_____

(December 30, 2010)

Before TJOFLAT and ANDERSON, Circuit Judges, and WOOD,[*] District Judge.

TJOFLAT, Circuit Judge:

The Grady Memorial Hospital in Atlanta, Georgia, is operated by the Fulton-DeKalb Hospital Authority, d/b/a Grady Health System ("Grady" or the "Hospital"). As part of its Department of Mental Health Services ("DMHS"), the Hospital maintains a Drug Dependence Unit ("DDU"). The plaintiffs in this case, identified pseudonymously as Jane Doe Nos. 1, 2, and 3, claim that while being treated for opiate addiction in the DDU's methadone clinic, they were subjected to sexual harassment at the hands of a substance abuse counselor, Steve Kimbrell. Seeking compensation for the harassment they suffered, plaintiffs sued Kimbrell, Grady, and those in charge of Grady's DMHS, DDU, Department of Human Resources ("DHR"), and Department of Employee Relations ("DER"). Their

_____

[*] Honorable Lisa Godbey Wood, United States District Judge for the Southern District of Georgia, sitting by designation.

complaint[1] contained seven counts: Count 1, a civil rights claim under federal law, Counts 2 through 6, tort claims brought under Georgia law, and Count 7, a claim for attorney's fees under Georgia law.[2] At issue in this appeal are the merits of the district court's orders dismissing Counts 2, 3, and 6 for failure to state a claim for relief, and granting summary judgment on Count 4.[3] Also at issue are the merits of the district court's order imposing sanctions against plaintiffs' counsel for pursuing a frivolous motion to disqualify the lawyers representing Grady and those in charge of its DMHS, DDU, DHR, and DER.

We find no error in the district court's disposition of Counts 2, 3, 4, and 6. And we find no abuse of discretion in the court's sanction order. We therefore affirm the court's judgment.

The facts underpinning plaintiffs' claims, as asserted in the complaint and borne out in the deposition testimony obtained during discovery, are not in

---

[1] We refer to the amended complaint as the complaint.

[2] The federal claim, Count 1, was brought under 42 U.S.C. § 1983, based on the Fourteenth Amendment's equal protection and due process clauses. The district court had federal question jurisdiction over the § 1983 claim under 28 U.S.C. § 1331. The court asserted its supplemental jurisdiction over the state law claims, Counts 2 through 7, under 28 U.S.C. § 1367.

[3] The plaintiffs settled their claims against Kimbrell. In this appeal, plaintiffs do not challenge the district court's dismissal of their Count 1 § 1983 claims against the remaining defendants.

material dispute.[4]  We begin, in part I, with a recitation of those facts, then proceed to the disposition of Counts 2, 3, 4, and 6 in the district court.  Part II addresses the merits of plaintiffs' challenges to the court's dismissal of those counts.  Part III considers the court's sanction order against plaintiffs' counsel.

I.

A.

In May 2004, Grady's DHR advertised a substance abuse counselor position in DDU's methadone clinic.  The advertisement, which was drafted by Venus Upshaw, the clinic's director, stated that applicants for the position had to "have at least one year experience working with opiate addicts in a substance abuse setting . . . [and would] provide case management, individual and group counseling to opiate addicts in a methadone treatment clinic."[5]  DHR forwarded

---

[4]  As we explain in part I.C, infra, we presume that, in granting portions of the defendants' motions to dismiss Counts 2, 3, and 6 and in denying plaintiffs' motion to vacate its orders, the district court augmented sub silentio the allegations of the complaint with facts revealed via deposition testimony taken during discovery—specifically the testimony of Steve Kimbrell—which plaintiffs contend buttressed the claims stated in those counts.  The facts recited below, in parts I.A and I.C, reflect such augmentation and are materially undisputed.  What is at issue here are the district court's rulings that such facts, considered in the light most favorable to plaintiffs, see Centurion Air Cargo v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005), failed to state a claim for relief under Georgia law on Counts 2, 3, and 6, and a case sufficient to withstand the defendants' motions for summary judgment on Count 4.

[5]  DHR advertised the counselor position after Upshaw sent DHR an "Employee Requisition" dated April 27, 2004.  The position would become vacant on May 7, 2004.  The Employee Requisition stated: "Position needs to be filled ASAP due to regulatory requirement (next audit scheduled for 5/24/04).  Please run an ad in the newspaper ASAP."

the resumes of qualified candidates it received to Upshaw, who, together with one of the clinic's substance abuse counselors, Terry Bones, interviewed the applicants and reviewed their resumes. Upshaw was impressed by Steve Kimbrell's resume because Kimbrell had a master's degree and several years' prior experience in methadone counseling in other substance abuse treatment facilities, including stints as a program director. As required by DHR's advertisement, he had been certified by the Georgia Addiction Counselors Association as a second-level Certified Addiction Counselor, known in the field as "CAC II."

During her interview of Kimbrell, Upshaw asked about some of his "short spurts" of employment which, she later said, caused her concern.[6] According to his application, Kimbrell had been employed as a program director at the New Horizons treatment facility in Columbus, Georgia, from August 2001 to June 2003; as a program director at the New Beginnings treatment facility in McAllen, Texas, from July 2003 to October 2003; and as a program director at American Psychiatric Partners of Chattanooga, Tennessee, from November 2003 to May 2004. Kimbrell did not include any further information regarding former employment in his application, even though the application required a "complete

---

[6] Upshaw revealed this concern in a deposition taken during the discovery phase of this case.

work history" for the last ten years and stated, in bold font, that "[a] resume in lieu of requested information is not acceptable."

In response to Upshaw's questions about his employment history, Kimbrell explained that he moved from Georgia to Texas because he had the opportunity to open a new program in Texas, and that he then left the Texas facility because he felt there were "unethical things going on" there. He said that he left his job at American Psychiatric Partners because he was employed on a contract basis and his employer did not supply the health benefits that he needed.

Later in the interview, Upshaw asked Kimbrell what his former employers would say about him, and he responded that they would say "all good things." Upshaw also asked him, "For those places that are still open, would you be eligible to go back there?" Kimbrell answered in the affirmative.

Following the interview, Upshaw completed an evaluation form in which she described Kimbrell as "highly qualified" and checked a box beside the statement "Interested in Hiring (Recruiter will make offer based on this selection)." Once Upshaw made this recommendation and forwarded it to DHR, DHR controlled the remaining steps in the hiring process.

After Upshaw completed her recommendation, Grady's hiring protocols dictated that DHR (1) conduct a criminal background check, which was completed

by an outside firm; (2) perform a drug screen; and (3) contact the applicant's past employers in accordance with a Georgia Department of Human Resources regulation, which Grady called an "employment verification."[7] Kimbrell's criminal background check and drug screen produced no evidence of criminal activity or drug use. The DHR assistant tasked with completing the "employment verification,"[8] Kim Clark, was unable to reach representatives of American Psychiatric Partners or New Beginnings who could tell her about Kimbrell's past employment. As was her practice, she made several attempts to contact previous employers listed on the application, and when she found no one who could

---

[7] The Department of Human Resources has since been renamed the Department of Human Services. The department regulation at issue, "Rules and Regulations for Narcotic Treatment Programs," reads, in relevant part:

> (8) Personnel Records. A program shall maintain written and verified records for each employee. Each employee file shall include:
>
>> (a) Identifying information including name, current address, current telephone number, and emergency contact persons;
>>
>> (b) A five-year employment history or a complete employment history if the person has not worked five years;
>>
>> (c) Evidence of a criminal record check obtained from law enforcement authorities that reflects the individual does not have a recent criminal history within the previous two years and that does not disqualify the individual from providing care to patients;
>
> . . . .

Ga. Comp. R. & Regs. 290-9-12-.09(8).

[8] Contacting an applicant's past employers was a task routinely assigned to DHR.

provide information about Kimbrell, she left messages and asked that a person with knowledge about his previous employment return her call.  Eventually, she was able to reach Jim Vaughns, who trained Kimbrell in counseling techniques at the New Horizons facility in Columbus.  Vaughns told her the dates of Kimbrell's employment and job title, relaying no negative information.  This was not unusual, she said: "Most employers give out very limited information.  I generally received only job title, dates of employment, and sometimes salary information."[9]

Based on Upshaw's positive recommendation, as well as the unremarkable results of the criminal background check, drug screen, and employer reference inquiries, Grady hired Kimbrell as a substance abuse counselor in July 2004.[10]

B.

Around April 4, 2005, Jane Doe No. 1 told Upshaw that Kimbrell had made inappropriate sexual advances toward her during counseling sessions.  Among her allegations were claims that he asked her to perform oral sex on him; told her that

---

[9]  Clark made this statement on deposition during discovery.  Michael Black, DHR's vice-president at the time, testified on deposition that "[i]t's a general rule throughout the industry, when we call a previous employer, we are only [] going to get certain information, dates of employment[,] position title."  He said that if Grady were asked for information about a former employee who had been fired for sexually abusing patients, Grady would not divulge that information because of the potential legal consequences adverse to Grady's interests.

[10]  The offer of employment was formally extended to Kimbrell by the head of DHR on behalf of Grady.

he wished to perform oral sex on her; asked her about her favorite sexual position; put his hands under her shirt, touched her stomach and back, and commented on how hot her skin was; asked her to bring nude pictures to her counseling sessions; asked her when she last experienced an orgasm and whether it was self-induced; and had erections while she was in his office. He often locked his office door during their counseling sessions despite her requests to keep it open.

On April 8, Upshaw suspended Kimbrell and reported Jane Doe No. 1's allegations to Grady's Public Safety Department.[11] The Department interviewed Kimbrell later in the day. On being confronted with the allegations, Kimbrell said that he was not surprised that Jane Doe No. 1 had accused him of sexual harassment, especially because, after he notified her that she had tested positive for methamphetamine use, she had said "I'm going to get you for this." Investigators asked Kimbrell if anyone had made allegations of sexual harassment against him at Grady prior to Jane Doe No. 1's allegations, or whether similar allegations had been made at his previous places of employment. Kimbrell initially denied that any such allegations had been made.

---

[11] In May, Upshaw also filed an ethics complaint with the Georgia Addiction Counselors Association.

On April 15 and 21, Jane Doe Nos. 2 and 3 formally complained that Kimbrell had subjected them to inappropriate sexual behavior during counseling sessions. They described conduct similar to that which Jane Doe No. 1 said she had experienced. As before, Upshaw informed Grady's Public Safety Department of the complaints. The Department contacted Kimbrell's former employers and learned that Kimbrell's unwelcome sexual behavior had not been confined to Grady. Kimbrell had voluntarily left or had been terminated from three previous positions. While working at a treatment facility in Huntsville, Alabama,[12] Kimbrell was terminated after a female patient asked what kind of underwear he wore, to which he responded that he did not wear underwear. When subsequently questioned about this on deposition in the present case, Kimbrell said that his Huntsville employer called this a "boundary issue."[13] At New Horizons in

---

[12] The Huntsville facility was also called New Horizons, though it was not affiliated with New Horizons in Columbus. On deposition taken during discovery, Kimbrell testified that he worked at New Horizons in Huntsville for two years prior to taking the position at New Horizons in Columbus.

[13] The Huntsville New Horizons facility's report, which was unavailable to Upshaw and Bones during Kimbrell's job interview but obtained during the prosecution of this case, was somewhat less charitable. The Huntsville official handling Kimbrell's termination wrote in her report that "[a]fter investigating group content . . . many clients discussed [Kimbrell's] perpetuating sexual content involving the only female client. He also discussed the personal life of [redacted] this client in open group forum. This is an ethical boundary issue, but also against group forum rules at [New Horizons], as well as the . . . sexual harassment policy." Kimbrell also made comments in group therapy sessions about a patient's attractiveness and how she should not have any trouble finding men.

Columbus, a patient accused him of attempting to exchange sex for money. On deposition, he claimed that he ultimately left the Columbus facility voluntarily. At American Psychiatric Partners he had what he described, again on deposition, as a "boundaries issue episode" while counseling an adolescent female patient. The separation notice he received indicated that the patient's mother complained that he instructed the patient to sit in his lap, straddling him.

Grady's investigation established that Kimbrell had sexually harassed the three plaintiffs, as they had alleged, and that, during his job interview with Upshaw and Bones, he had withheld the truth about the circumstances under which he left his previous employments. Grady therefore terminated his employment in May 2005.

## C.

The plaintiffs instituted this action on August 31, 2005. As noted in the introduction to this opinion, the claims before us here are the state law claims asserted in Counts 2, 3, 4 and 6.[14] Count 2, styled "Sexual Harassment," was brought against Grady and those in charge of the Hospital's DMHS, DDU, DHR, and DER—William Reed, Venus Upshaw, Anthony Stovall, and Robert Rohr,

---

[14] In listing the defendants named in these counts, we omit all reference to Kimbrell, as he has been dropped from the case via settlement with the plaintiffs. See supra note 3.

respectively.[15]  Count 3, "Professional Negligence," was brought against Grady and Upshaw.  Count 4, "Negligent Hire and Negligence Per Se," and Count 6, "Intentional Infliction of Emotional Distress," were brought against Grady, Reed, Upshaw, Stovall, and Rohr.

The defendants responded to the plaintiffs' complaint with motions to dismiss.  See Fed. R. Civ. P. 12(b)(6).  On May 3, 2006, the district court, addressing the sufficiency of Counts 1, 2, 3, and 6, entered an order granting in part and denying in part the defendants' motions.  The court dismissed Count 1 as to Rohr, Reed, and Upshaw,[16]  Count 2 as to Grady and Rohr, Count 3 in its entirety,[17] and Count 6 as to Grady, Reed, Upshaw, and Rohr.  On July 14, 2006, on reconsideration, the court dismissed Count 1 as to Stovall,[18] Count 2 as to Reed, Upshaw, and Stovall, and Count 6 as to Stovall.  For the purposes of this

---

[15]  Plaintiffs sued the individual defendants in both their official and individual capacities. This appeal is limited to plaintiffs' claims against these defendants in their individual capacities.

[16]  Count 1 was brought against all individual defendants, but not against Grady.

[17]  The court treated Count 3, a claim for professional negligence, as more accurately a claim for "ordinary negligence" subsumed within Count 4, as both were based on the defendants' alleged negligence in the hiring, supervision, and retention of Kimbrell.  We likewise treat Count 4 as incorporating the allegations of Count 3.

[18]  After dismissing Count 1, the federal claim, in its entirety, all that remained were plaintiffs' state law claims.  The court exercised its supplemental jurisdiction over those claims, see 28 U.S.C. § 1367, eventually disposing all of them adversely to plaintiffs.

appeal, what remained of plaintiffs' state law claims were the allegations against all five defendants contained in Count 4.[19]

Meanwhile, the parties had been engaged in discovery, and on June 16, 2006, plaintiffs deposed Kimbrell. He testified that the behavior complained of was part of his approach to counseling patients:

Q. So the touching in which you engaged in this case was something you considered to be part of the therapeutic process and part of your job, correct?

A. Yeah. I mean it was a part of a therapeutic lesson to teach [Jane Doe No. 3] about her own personal space.

. . . .

Q. Mr. Kimbrell, I want to ask you a little more about this theory of boundary -- working on boundary issues with patients. As I understand it, what you would do is essentially set up a situation where you would cross the patient's boundaries?

A. Yes, sir.

Q. And then tell them that you had crossed their boundaries, correct?

A. Yes, sir.

Q. And then you would [tell] them that they were wrong for having let you do so?

A. I wouldn't say wrong. I would try to find out why they felt that it was appropriate to allow that to happen.

Q. Okay.

A. So we can get into some underlying issues as to why they feel like that their self-worth is so minimal to allow that to happen.

Q. Is there no other way that you could have explored their boundaries other than violating them?

---

[19] Count 5, a claim of negligent supervision and retention, also remained, but we decline to discuss the court's disposition of that claim because it is not before us on appeal.

A.    Every counselor has a different technique.  This is one that I chose to do.  I'm not saying that it is probably one that another counselors [sic] may or may not do.  I can't speak for other counselors.  It's just with this population, sometimes you need to do something a little above and beyond to get the point across.

. . . .

Q.    What is your boundary in your relationships with your patients on what is appropriate interaction, physical interaction?
A.    When it comes to a boundary episode?
Q.    No.  What is your boundary; what do you consider to be the boundary that you set as a professional in interacting with your female clients?

. . . .

A.    My boundaries are to the point where the patient -- to get to the point where the patient can understand and realize what their limitations are.  I -- I don't know if I can explain what my boundaries are as far --
Q.    Isn't it the counselor's obligation to set the boundaries, not to violate them?
A.    If you are intending to do harm -- which I've never done.  It's never been the intent.  It's never been the intent to do something to hurt someone.  It's always been a teaching technique.  That's the whole idea.
Q.    So as long as you're doing it with good intentions, is there anything that is off limits?
A.    Oh, yeah, I mean you don't -- I mean you don't -- you know, to take people's clothes off or, you know, you don't get so close up into somebody, you know, that they feel like they're being threatened or anything like that.

Armed with this testimony, plaintiffs moved the district court to vacate and revise its May 3 and July 14 orders, which together operated to dismiss the state law claims in Counts 2, 3, and 6 for failure to state a claim.  The plaintiffs argued that Kimbrell's testimony showed that he was acting within the scope of his

14

employment, and that they therefore had stated a case against Grady, if not the other defendants. The court construed the motion as one for reconsideration and summarily denied it.[20]

On April 10, 2007, the five defendants moved the court for summary judgment on, inter alia, the Count 4 claims. See Fed. R. Civ. P. 56. The district court granted the motions. The court thereafter sanctioned plaintiffs' counsel for prosecuting a frivolous motion for the disqualification of defense counsel. Following the entry of final judgment, plaintiffs and their attorneys took this appeal.

II.

We begin our review by addressing, in part II.A, plaintiffs' claims for sexual harassment and intentional infliction of emotional distress asserted in Counts 2

---

[20] The district court's order denying the plaintiffs' motion to vacate did not indicate whether the court considered the additional facts disclosed in Kimbrell's deposition testimony. In reviewing the court's disposition of Counts 2, 3, and 6, we treat the court as having considered those facts in light of plaintiffs' claim that they buttressed the complaint's allegations. See supra note 4. Of course, in ruling on the defendants' motions for summary judgment on Count 4, the court considered all relevant evidence the record presented.

15

and 6, respectively.[21]  We then consider, in part II.B, the negligence claims

asserted in Count 4.[22]

A.

Plaintiffs do not claim that the defendants directly committed the acts that

form the basis of their claims in Counts 2 and 6.  Rather, the defendants' potential

liability for Kimbrell's actions necessarily rests on the theory of vicarious liability.

We begin with the claims against Grady, then assess the claims against the

individual defendants, Reed, Upshaw, Stovall, and Rohr.

1.

The claims against Grady in Counts 2 and 6 are based on the theory of

respondeat superior.  Under Georgia law, "[e]very person shall be liable for torts

committed by . . . his servant by his command or in the prosecution and within the

scope of his business, whether the same are committed by negligence or

voluntarily."  O.C.G.A. § 51-2-2.  Respondeat superior has been

---

[21]  We review these two counts together because the only evidence of the sexual harassment and emotional distress plaintiffs allegedly suffered was as a result of Kimbrell's inappropriate conduct.

[22]  See supra note 17.  In reviewing the district court's grant of summary judgment under Federal Rule of Civil Procedure 56, we view the evidence presented to the district court in the light most favorable to plaintiffs.  Hearn v. McKay, 603 F.3d 897, 901 (11th Cir. 2010) (per curiam).

thoroughly addressed by the Georgia appellate courts, both generally and with regard to sexual misconduct by employees.

In order for an employer to be held liable under the theory of respondeat superior, two elements must be present: "first, the servant must be in furtherance of the master's business; and, second, he must be acting within the scope of his master's business." Piedmont Hosp., Inc. v. Palladino, 580 S.E.2d 215, 217 (Ga. 2003) (citations and internal quotation marks omitted). Here, the question is whether the misconduct Kimbrell engaged in while employed within the DDU was sufficiently in furtherance of Grady's business and within the scope of his employment to trigger the theory. We conclude that the answer is no.

"Georgia courts have consistently held that an employer cannot be held liable under respondeat superior for an employee's sexual misconduct when the alleged acts were not taken in furtherance of the employer's business and were outside the scope of employment." Id. (citations omitted); see also Alpharetta First United Methodist Church v. Stewart, 472 S.E.2d 532, 535 (Ga. Ct. App. 1996) ("[I]t is well settled under Georgia law that an employer is not responsible for the sexual misconduct of an employee." (citations omitted)). As one Georgia court explained, "[t]he basis for these holdings is that these types of torts, being purely personal in nature, are unrelated to the employee's duties and, therefore, are

17

outside the scope of employment because they are not in furtherance of the master's business." Stewart, 472 S.E.2d at 536 (citations omitted). If an employee commits "an act entirely disconnected from [his master's business], and injury to another results from the act, the servant may be liable, but the master is not liable." Palladino, 580 S.E.2d at 217 (quoting Brownlee v. Winn-Dixie Atlanta, Inc., 523 S.E.2d 596, 598 (Ga. Ct. App. 1999)). Thus, that Kimbrell's actions occurred while on the job is not dispositive.

Palladino is quite instructive for our analysis, and we find it controlling. In that case, a hospital employee was responsible for providing post-surgical treatment to a patient who had undergone angioplasty surgery. Id. at 216. Because the surgery required the insertion of a sheath in the femoral artery of the patient's groin, the employee was authorized to enter his room alone, check his groin area for any problems, and, if medically required, manipulate the patient's genitals to perform the authorized tasks. Id. The patient awoke following surgery to find the employee manipulating his genitals in a sexual manner. The patient attempted to hold the hospital liable for the employee's misconduct under a host of theories, including respondeat superior. Id.

The Supreme Court of Georgia held that the hospital could not be held vicariously liable under the theory of respondeat superior for the actions of its

18

employee. Id. at 217. Adhering to the principles expressed above, the court stated that there "can be no disputed issue of fact that if, as alleged, [the employee] improperly manipulated [the patient's] genitals . . . , those acts (1) were committed for purely personal reasons associated solely with [the employee's] own gratification, and (2) were entirely disconnected from the scope of [the employee's] employment" at the hospital. Id. In the court's view, the moment that the employee deviated from his job duties in order to act on his sexual impulses, he was "acting not as a hospital employee, but rather purely for his own personal reasons." Id. Pursuant to this reasoning, the court reversed the court of appeals and declared that summary judgment for the employer was appropriate on these facts. Id. We find it particularly noteworthy that the court came to this conclusion despite the employee's authorization to touch the patient's genitals for medical purposes. See id. at 216.

In an attempt to distinguish the case at hand from Palladino, plaintiffs place great emphasis on the deposition testimony of Kimbrell and his subjective belief that his actions were part of his job and therefore within the scope of his employment. Plaintiffs rely on Johnson v. Allen, 613 S.E.2d 657 (Ga. Ct. App. 2005), for the proposition that the motivation of an employee is a controlling factor in the respondeat superior inquiry. Their reliance is misplaced; Johnson

19

does not stand for such a broad proposition. In <u>Johnson</u>, the court of appeals affirmed the trial court's denial of summary judgment for an employer where the manager of operations in a cold storage facility used a camera to monitor the women's restroom. 613 S.E.2d at 659, 662. The camera had been put into place by the employer in response to rumors that drugs were being sold in the restroom, and the employer had instructed the manager to observe activity within the restroom. <u>Id.</u> at 659. The court found it impossible to distinguish between observations of the women's restroom explicitly authorized by the employer on one hand and observations made purely for the manager's own personal reasons on the other; "there is no evidence that [the manager] acted solely for his personal sexual gratification in this case, as opposed to conducting an investigation of suspected criminal conduct for his employer." <u>Id.</u> at 663.

In short, when the allegedly tortious behavior is identical to behavior authorized by the employer—i.e., observing women in the restroom using a hidden camera installed by the employer—a question of fact remains whether the employee is acting within the scope of his employment. But because Grady did not mandate the behavior complained of and Kimbrell abused his authority to pursue his own sexual agenda, we conclude that his conduct was analogous to that of the employee in <u>Palladino</u> and therefore outside the scope of his employment.

20

In so concluding, we in no way run afoul of the entirely reasonable holding of Johnson.[23]

Thus, we agree with the district court's conclusion that the complaint's factual allegations established that, like the employee in Palladino, Kimbrell acted purely for his own personal gratification and outside the scope of his employment in his mistreating of plaintiffs. Grady was therefore entitled to the dismissal of Counts 2 and 6.[24]

2.

Plaintiffs' claims against the individual defendants in Counts 2 and 6 are based on the theory that they were "'joint tort feasors' within the meaning of the

[23] Were Kimbrell instructed to thoroughly pat down his patients, for example, a claim that such a pat down constituted sexual assault for which Grady may be liable would be analogous to the claim presented in Johnson v. Allen, 613 S.E.2d 657 (Ga. Ct. App. 2005), and would likely survive a motion to dismiss. But nothing before the district court in this case indicated that Grady granted Kimbrell any such authority, or the authority to make the sexual advances that occurred here. That Kimbrell attempted to explain away his misconduct as part of his counseling "technique," then, is largely irrelevant to Grady's potential liability. Assuming for sake of argument that Kimbrell was authorized to discuss personal sexual relationships with his patients, we find that authority analogous to the employee's authority in Piedmont Hospital, Inc. v. Palladino, 580 S.E.2d 215 (Ga. 2003) to manipulate his patient's genitals for medical purposes; once Kimbrell used his position to further his own sexual goals, he ceased to act within the scope of his employment.

[24] This holding, consistent with Georgia law, does not, as plaintiffs fear, insulate employers from liability for all sexual misconduct of employees. As seen in Johnson, if an employer authorizes behavior that could be directly utilized for sexual misconduct, a claim based on respondeat superior may be heard by the jury. 613 S.E.2d at 662. Further, as we discuss in part II.B, infra, employers still retain a duty to exercise reasonable care in hiring, supervising, and retaining employees. It is worth noting, of course, that Kimbrell was personally exposed to liability for his sexual misconduct. Indeed, he settled with each of the plaintiffs.

21

Official Code of Georgia" because they "entrusted" Kimbrell with the authority to commit the acts plaintiffs complained of. We find no support for this claim in Georgia law.

The Georgia statutes establish joint tortfeasor liability when a person "maliciously procures" someone to injure another person, whether via "an actionable wrong or a breach of contract." O.C.G.A. § 51-12-30. The Georgia courts have consistently held that "a malicious act involves all that is usually understood by the term 'wilful,' and is further marked by either hatred or ill will or by such utter recklessness and disregard of the rights of others as denotes a corrupt or malevolent disposition." Harvey v. Nichols, 581 S.E.2d 272, 277 (Ga. Ct. App. 2003) (quoting Partain v. Maddox, 206 S.E.2d 618, 622 (Ga. Ct. App. 1974)); see also Vickers v. Motte, 137 S.E.2d 77, 80 (Ga. Ct. App. 1964).

The complaint contains no allegation that any of the individual defendants acted maliciously or with such recklessness "as denotes a corrupt or malevolent disposition." Nor does the complaint allege that any of the individual defendants procured Kimbell with the intent to injure the plaintiffs, such that any individual

defendant would become a joint tortfeasor with Kimbrell. Accordingly, the

district court did not err in rejecting plaintiffs' theory of joint tortfeasor liability.[25]

B.

Counts 4 and 5 alleged that plaintiffs' injuries were the result of the

"negligent hire" "negligence per se," and "negligent supervision and retention" of

Kimbrell as well as "negligence per se" committed by Grady and his staff.[26] The

district court disagreed, concluding that the evidence in the record failed to

support the allegations. In their opening brief on appeal, plaintiffs did not

challenge the district court's rejection of their claim of negligent supervision and

retention. What remains, therefore, are plaintiffs' challenges to the district court's

---

[25] In an effort to circumvent the high bar of O.C.G.A. § 51-12-30, plaintiffs argue on appeal that it "has long been Georgia law that where 'the alleged negligent acts of two or more tortfeasors result in a single and indivisible injury . . . the alleged tortfeasors may be sued jointly.'" Appellant's Br. 46 (citing Parks v. Palmer, 260 S.E.2d 493, 495 (Ga. Ct. App. 1979); Sims v. Bryan, 230 S.E.2d 39, 42 (Ga. Ct. App. 1976)). In other words, plaintiffs contend that negligence in the hiring of an employee should expose individuals in the human resources department of an employer to joint liability for any tort committed by the hired employee. While negligence of an employee may expose an employer to liability under the theory of respondeat superior, as discussed in part II.A.1, supra, we have seen no indication that the Georgia courts would adopt plaintiffs' proposition for such far-reaching vicarious individual liability, and thus dispatch the proposition here. Even if this were an incorrect reading of Georgia law, it is of no import to the disposition of this case, as we find, in part II.C, infra, that the actions of the individual defendants relating to the hiring of Kimbrell were reasonable as a matter of Georgia law.

[26] As discussed in note 17, supra, the district court treated Count 3's allegation of "professional negligence" as a mislabeled claim for ordinary negligence and considered it alongside Count 4.

23

rejection of their Count 4 claims of negligent hiring and negligence per se.

Plaintiffs assert that the individual defendants and Grady must be held to answer

for the hiring of Kimbrell under these two related theories. First, plaintiffs urge

that, under Georgia tort law, the defendants owed plaintiffs a duty of due care not

to recommend the hiring of a substance abuse counselor they knew, or should have

known, would likely to subject them to the sort of inappropriate acts Kimbrell

committed, and that they breached this duty.[27] Second, plaintiffs purport that the

individual defendants, and therefore Grady, breached a standard of care prescribed

by Georgia statute and regulations promulgated thereunder, and further that such

breach constituted negligence per se. We consider the alleged negligence at

common law and under the per se doctrine in turn.

1.

Upshaw, DDU's clinical director, interviewed Kimbrell and recommended

that DHR consider hiring him for the substance abuse counselor position after

checking his background according to the protocols outlined in part I.A, supra.

Stovall, the head of DHR, assigned Kim Clark, one of his assistants, to perform

the background check. There is nothing in the record to support plaintiffs'

---

[27] Georgia has codified some features of the common law dealing with negligent hiring. See O.C.G.A. 34-7-20.

24

argument that, in so doing, Stovall breached the duty of care plaintiffs assert. Stovall, like Reed and Rohr, the heads of DMHS and DER, respectively, had no involvement in determining Kimbrell's qualification or fitness for the counselor position. Thus, their liability, if any, for Upshaw's or Clark's conduct would have to be vicarious. And there is nothing in the record that makes out a case of vicarious liability against any of them. Accordingly, the district court did not err in granting Stovall, Reed, and Rohr summary judgment on Count 4.

Plaintiffs' hiring claims therefore center on whether Upshaw and Clark, who was not sued, had a duty to plaintiffs to exercise ordinary care in recommending for employment a candidate for the substance abuse counselor position who was qualified and fit for the job—specifically, a person not likely to engage in the sexual misconduct complained of. We assume for sake of argument that Upshaw and Clark owed plaintiffs such a duty of care and that if either Upshaw or Clark breached it by recommending someone she knew, or should have known, presented a risk of sexual misconduct, Grady would be liable. If Upshaw committed the breach, she would be liable, too.

We begin our analysis by observing that, in Georgia, an employer "is bound to exercise ordinary care in the selection of employees and not to retain them after

knowledge of incompetency." O.C.G.A. § 34-7-20.[28] "The appellate courts [of Georgia] have recognized that an employer may be liable for hiring or retaining an employee the employer knows or in the course of ordinary care should have known was not suited for the particular employment." Munroe v. Universal Health Servs., Inc., 596 S.E.2d 604, 605 (Ga. 2004) (citations omitted); see also Stewart, 472 S.E.2d at 536 ("An employer may not be held liable for negligent hiring or retention unless the plaintiff shows the employer knew or should have known of the employee's violent and criminal propensities." (citing Thurmond v. Richmond Cnty. Bd. of Ed., 428 S.E.2d 392, 395 (Ga. Ct. App. 1993); Odom v. Hubeny, Inc., 345 S.E.2d 886, 888 (Ga. Ct. App. 1986))).

It is undisputed that neither Upshaw nor Clark had actual knowledge of Kimbrell's tendency to harass patients, as evidenced by his behavior in previous employments. For liability to attach, then, plaintiffs had to show that Upshaw or Clark, through the exercise of ordinary care, should have known of these tendencies, i.e., Kimbrell's "propensity for sexual misconduct." See Stewart, 472 S.E.2d at 536 (citing Slaton v. B & B Gulf Serv. Ctr., 344 S.E.2d 512 (Ga. Ct. App. 1986)).

---

[28] O.C.G.A. § 34-7-20 is a codification of common law. See e.g., Cherry v. Kelly Servs., Inc., 319 S.E.2d 463, 464 (Ga. Ct. App. 1984).

We find that the screening protocols Upshaw and Clark followed, while less than ideal, were sufficient to satisfy the standard of care Georgia law prescribes in the hiring context. Instructive for our analysis is Munroe. In Munroe, a mental health assistant at a residential treatment facility administered incapacitating medication to a patient and raped her. 596 S.E.2d at 605. In concluding that the employer was entitled to summary judgment on negligent hiring claims, the Supreme Court of Georgia noted that the employee provided dishonest information in his employment application. Id. In exercising what the supreme court deemed to be ordinary care as a matter of Georgia law, the employer hired a private investigation company, which found, among other things,

> that [the employee] had misrepresented to his own benefit the reason why he had been fired by a previous employer; and that [the private investigation company] had been unable to confirm the existence of two prior employers listed by [the employee] or any details of [his] alleged employment at these businesses, one of which had operated the facility where [the employee] gained the personal care experience [the employer] considered critical to his employment as a mental health assistant.

Id. at 607. The supreme court emphasized that, despite uncovering these potential red flags, the investigators did not find any evidence of criminal activity. Id. at 608.

Further, the evidence in <u>Munroe</u> showed that the person tasked with interviewing the employee prior to the employment decision could not remember doing so and that the employee in charge of hiring did "not obtain the independent confirmation she felt was needed" regarding the employee's previous employment. <u>Id.</u> at 607–08. "Nor d[id] it appear that anyone at [the employer] required [the employee] to explain the mistakes found in his application form." <u>Id.</u> at 608. Thus, while the <u>Munroe</u> investigation had unveiled "problems," "there [was] no question of fact that these problems did not involve any accusations of criminal activities or violent behavior or any other indication that [the employee] posed any risk of personal harm to others." <u>Id.</u> As a result, "the evidence uncontrovertedly establishe[d] that [the employer] did not disregard indications of a propensity to inflict physical harm which ought to arouse suspicion and investigation." <u>Id.</u> (citations and punctuation omitted); <u>see also</u> <u>Bunn-Penn v. S. Reg'l Med. Corp.</u>, 488 S.E.2d 747, 749–50 (Ga. Ct. App. 1997) (holding that a hospital was entitled to summary judgment on negligent hiring and retention claims based on a sexual assault committed by an emergency room nurse, despite reports from other nurses about potentially "inappropriate" tendencies around female patients).

Upshaw and Clark clearly met the standard of care set forth in Munroe.[29] It is uncontested that Kimbrell's criminal background check—conducted by an outside firm—produced no evidence of convictions or criminal activity. His drug screen showed no evidence of drug use. Employees of Grady successfully contacted a representative of at least one former employer and received no negative information or any indication that Kimbrell had any tendency to commit acts of sexual misconduct.[30] This evidence is "plain, palpable and undisputable" that neither Upshaw nor Grady are liable to plaintiffs under a negligent hiring theory for the injuries they sustained because of Kimbrell's actions. See Munroe, 596 S.E.2d at 608. We affirm the district court's grant of summary judgment to Upshaw, and therefore to Grady, on plaintiffs' common law negligence claims.[31]

[29] Plaintiffs point to Underberg v. Southern Alarm, Inc., 643 S.E.2d 374 (Ga. Ct. App. 2007), to argue that Clark's failure to contact employers leaves an issue for the jury as to their negligent hiring claim. We do not find Underberg to counsel such a holding. In Underberg, a convicted violent felon was hired by a home security system company to market its services door-to-door. Id. at 375. The employee then kidnaped a customer at gunpoint. Id. The company did not conduct a criminal background check, and the court held that granting summary judgment on the negligent hiring claim was error. Id. We find the facts in the case at hand more analogous to Munroe v. Universal Health Services, Inc., 596 S.E.2d 604 (Ga. 2004), and therefore follow its holding.

[30] Plaintiffs attack the district court's reliance on Clark's deposition testimony regarding her contact with Kimbrell's past employers, claiming the testimony to be unreliable and inadmissible. We need not address these concerns, as the efforts made by Grady were reasonable as a matter of law—regardless of the exact number of phone calls made by Clark—under Munroe.

[31] We share plaintiffs' concern that an easily satisfied standard of care in negligent hiring cases may provide insufficient incentive for Georgia employers to ensure safety in the workplace.

29

2.

Plaintiffs further assert that the defendants were negligent per se because they failed to "maintain written and verified records" for Kimbrell, including a "five-year employment history or a complete employment history if [Kimbrell] ha[d] not worked five years." See Ga. Comp. R. & Regs. 290-9-12-.09(8).[32] In plaintiffs' view, the defendants' failure to comply with this regulation led directly to Kimbrell's mistreatment of plaintiffs and therefore exposes the defendants to liability for negligence per se.

As articulated by the Court of Appeals of Georgia,

Georgia law allows the adoption of a statute as a standard of conduct so that its violation becomes negligence per se. "In determining whether the violation of a statute or ordinance is negligence per se as to a particular person, it is necessary to examine the purposes of the legislation and decide (1) whether the injured person falls within the class of persons it was intended to protect and (2) whether the harm complained of was the harm it was intended to guard against."

---

We fear, however, that placing undue emphasis on the contacting of previous employers would greatly burden employers with little added benefit to workplace safety. As noted in part I.A, supra, hospital employers are generally hesitant to share much information about past employees for fear of legal consequences; as a result, requiring more diligence in this area could merely send future human resources personnel on fools' errands. In any event, it is our duty in this case to follow Georgia law, not alter it as we see fit.

[32] This regulatory prescription was adopted pursuant to O.C.G.A. § 26-5-2 et seq. Ga. Comp. R. & Regs. 290-9-12-.01.

<u>Brown v. Belinfante</u>, 557 S.E.2d 399, 403 (Ga. Ct. App. 2001) (citations and punctuation omitted). In addition to the violation of a statute or ordinance, "[t]he violation of a regulation . . . can likewise establish that a defendant breached a duty owed to a plaintiff as a matter of law" and, thus, be negligence per se. <u>McLain v. Mariner Health Care, Inc.</u>, 631 S.E.2d 435, 437 (Ga. Ct. App. 2006) (citations omitted).

An examination of the purpose of the regulation found in 290-9-12-.09(8) leads us to conclude that the regulation was intended for licensing and inspection purposes and not for the creation of a standard of conduct to protect individuals, like plaintiffs, in a narcotic treatment program. The regulation is found in Chapter 290-9-12 of the Georgia Administrative Code, which is titled "Rules and Regulations for Narcotic Treatment Programs." We need not look beyond the plain language of that chapter to decipher its purpose: "The purpose of these rules is to provide for the licensing and inspection of narcotic treatment programs." Ga. Comp. R. & Regs. 290-9-12-.02. We decline to accept plaintiffs' invitation to impute another purpose for the regulation. We conclude that the regulation did not prescribe the standard of conduct Grady had to adhere to in determining

31

whether Kimbrell was qualified for the substance abuse counselor position and thus eligible for employment.[33]

Our conclusion is similar to that drawn by the court in <u>Brown</u>. In <u>Brown</u>, a patient attempted to charge a dentist with negligence per se for violation of a regulation promulgated by the Georgia Board of Dentistry concerning licensing and discipline for engagement in "unprofessional conduct." 557 S.E.2d at 403. The court concluded that while the actions of the dentist may have been unprofessional, "that is a question for the Board, not the courts." <u>Id.</u> The court continued, "[a]lthough the rule serves to regulate the dental profession, it does not establish a standard of conduct, the violation of which creates civil liability against the dentist in favor of a patient." <u>Id.</u>

We need not address whether the defendants breached the prescriptions found in 290-9-12-.09(8), nor need we consider the issue of causation—whether the breach caused the injuries plaintiffs sustained. The regulation provides a standard to guide the Georgia licensing authority and not a standard of conduct the breach of which would render an employer negligent per se. Accordingly, the

_____

[33] Appellants also contend that regulatory prescriptions found in Chapter 290-4-12, titled "Narcotic Treatment Programs," provide a relevant standard of conduct for a negligence per se analysis. But as with Chapter 290-9-12, the purpose of Chapter 290-4-12 is "to provide for the licensing and inspection of narcotic treatment programs." Ga. Comp. R. & Regs. 290-4-12-.02. We thus reject the adoption of such regulations as a standard of conduct in this scenario.

32

district court did not err in rejecting plaintiffs' claim that Kimbrell's hiring constituted negligence per se.

III.

On June 22, 2006, after the district court had entered its May 3, 2006 order dismissing several claims from the complaint,[34] plaintiffs' counsel, Matthew C. Billips of Miller, Billips & Ates, moved the district court for an order requiring Hollowell, Foster & Gepp, counsel for Grady and the individual defendants (except Kimbrell), to show cause why they should not be disqualified from simultaneous representation of Grady and the individual defendants. Billips represented that there existed "an 'extraordinary' conflict of interest between some of the individual defendants and Grady." Order 2, Oct. 19, 2006. Billips proposed that the court disqualify the law firm from simultaneously representing Grady and the individual defendants unless Grady "provided separate and independent counsel to advise the individual . . . defendants on the potential conflict." Id. at 4.

On July 18, 2006, four days after the court, acting on defense counsel's motions for reconsideration of the May 3 order, entered an order dismissing all

---

[34] On May 3, the court dismissed Count 1 as to Reed, Rohr and Upshaw, Count 3 in its entirety, Count 2 as to Grady and Rohr, and Count 6 as to Grady, Reed, Upshaw, and Rohr. The claims remaining (aside from those against Kimbrell) were against Stovall in Count 1, Reed, Upshaw, and Stovall in Count 2, Grady and the individual defendants in Counts 4 and 5, and Stovall in Count 6. See supra part I.C.

claims against except those pending against Grady and the individual defendants in Counts 4 and 5, Randy C. Gepp, on behalf of Hollowell, Foster & Gepp, sent Billips a letter notifying him that his June 22 motion was frivolous and that sanctions would be sought under Federal Rule of Civil Procedure 11 if he did not withdraw the motion within 21 days.  Id. at 3.  Billips did not withdraw the motion.  On August 17, the court heard the motion, and on August 21, entered an order denying it.  The court found "the Motion to be totally without merit and unsupported by any current case law or the extension of any case law."  Order 2, Aug. 21, 2006.  In addition, the court found "the Motion to be . . . filed for the purpose of harassment."  Id.  Based on those findings, the court ordered that "Plaintiffs respond to Defendants' Motion for Sanctions so that the Court may consider further action in this matter."  Id.

On October 19, 2006, the district court considered plaintiffs' response to the motion for sanctions, adhered to its August 21 ruling that the motion was frivolous and filed for the purpose of harassment, and ordered Billips and his law firm to pay Grady the attorney's fees it incurred, $8,240, in defending against Billips's motion.  Order 7–8, 11, Oct. 19, 2006.  Billips and his firm now appeal the court's decision.  We review the decision for abuse of discretion.  Cooter & Gell v.

34

Hartmarx Corp., 496 U.S. 384, 404, 110 S. Ct. 2447, 2460, 110 L. Ed. 2d 359 (1990).

We find no abuse of discretion here. As the district court correctly observed, Billips, in prosecuting his motion, provided no legal authority for the position he was taking. The court further observed that

> a reasonable and responsible attorney in Mr. Billips' position would have known that: (1) his demand that Grady provide at its expense independent counsel to advise each of the individual Defendants on the potential for a conflict of interest was not supported by the clear standards of the Georgia Rules of Professional Conduct; (2) Mr. Gepp had complied with the Georgia Rules of Professional Conduct by appropriately advising his clients and obtaining conflict waiver letters; (3) the Plaintiffs had no standing to seek Hollowell, Foster & Gepp's disqualification unless they could show a violation of the rules sufficiently severe to call in question the fair and efficient administration of justice. The possibility of delay or a later claim of inadequate representation due to a conflict do not come close to meeting this standard.
>       At this point, Mr. Billips should have withdrawn the motion. If he had done so, the matter would have ended right there for everyone concerned. By not doing so, and by stubbornly and recklessly refusing to back down . . . Billips continued his campaign of vilification against the Grady defendants.

Order 7–8, Oct. 19, 2006. The court's finding that a reasonable attorney would not have represented, as Billips did, that the motion he filed satisfied the requirements of Rule 11(b)(1), (2) and (3) is unassailable.[35]

_____

[35] In filing the motion, Billips certified that

AFFIRMED.

---

to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the . . . legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishment of new law;

(3) the factual contentions have evidentiary support . . . .

Fed. R. Civ. P. 11(b)(1), (2), (3).  In assessing an attorney's compliance with the rule, we employ an objective standard.  Worldwide Primates, Inc. v. McGreal, 87 F.3d 1252, 1254 (11th Cir. 1996).